UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

Erie Insurance Exchange, et al.     *
         Plaintiff        *
                              *
     v.                        *      CIVIL NO. L-08-33
                              *
Davenport Insulation, Inc., et al.     *
         Defendants     *
                              *

*******

MEMORANDUM

This case begins with a fire at the residence of Sharon and Robert McNutt on Kent Island in Stevensville, Maryland. The insurer of the McNutts' home, Plaintiff Erie Insurance Exchange ("Erie"), sues its subrogation target, Defendant Builder Services Group, Inc. ("BSG"), for negligent installation of a fireplace.[1] Now pending is BSG's Motion for Summary Judgment (Docket No. 30). In its motion, BSG seeks dismissal of the case on evidence spoliation grounds. On July 2, 2009, the Court held a three-hour hearing on BSG's pending motion. For the reasons stated herein, by separate Order, the Court will grant BSG's motion and dismiss the case.

I.      **Introduction**

It is undisputed that Erie, through the contractors it hired to restore the McNutts' house, destroyed all of the physical evidence of the fire. The destruction occurred seventeen months before Erie notified BSG of its claim. BSG contends that its ability to defend itself has been severely and incurably prejudiced by Erie's evidence spoliation.

The Court agrees. The fire had no obvious and incontrovertible origin. After initially disagreeing as to the cause of the conflagration, Erie's experts settled on the theory that BSG, the

---

[1] Davenport Insulation, the first defendant in this case, is the trade name of Builder Services Group.

firebox installer, omitted a safety strip designed to protect the wooden framing from burning embers.  Having been deprived of access to the scene, BSG is in no position to evaluate the soundness of this theory.

Because Erie's failure to notify BSG before the scene was destroyed was negligent, and because no other remedy would level the playing field, the Court will, in accordance with the spoliation doctrine, dismiss the case with prejudice.

## II.    Legal Standard

The controlling case on spoliation of evidence in this circuit is <u>Silvestri v. General Motors Corp.</u>, 271 F.3d 583 (4th Cir. 2001).  Mark Silvestri was driving a General Motors car when he crashed into a roadside utility pole.  The airbag did not deploy.  Before filing suit against GM, Silvestri's experts reviewed the crash scene and the car in its immediate post-crash condition.  They concluded that the airbag system was defective.  Silvestri waited nearly three years before notifying GM of his potential claim.  In the interim, the insurance company took possession of the car, repaired it, and resold it.  As a result, once GM had notice of Silvestri's claim, it had no opportunity to inspect the car in its immediate post-crash condition.  GM sought dismissal of the case on evidentiary spoliation grounds.

The Fourth Circuit established an either/or test for district courts to use in evidence spoliation cases.  To determine what sanction is necessary,

> the district court must consider both the spoliator's conduct and the prejudice caused and be able to conclude either (1) that the spoliator's conduct was so egregious as to amount to a forfeiture of his claim, or (2) that the effect of the spoliator's conduct was so prejudicial that it substantially denied the defendant the ability to defend the claim.

<u>Id.</u> at 593.  Finding these tests to be satisfied, the Fourth Circuit affirmed the district court's dismissal of the case.

As to the first prong, the Fourth Circuit held that some degree of fault is required.  The court found that Silvestri and his counsel were at least negligent because they failed to provide timely notice to GM of a potential claim before the car had been repaired by the insurance company.   The court made this finding even though the insurance company, rather than Silvestri and his counsel, had control over the car and its repair.  As to the second prong, the court held that "require[ing] General Motors to rely on the evidence collected by Silvestri's experts in lieu of what it could have collected would result in irreparable prejudice."  Id. at 594.

Another case of note is King v. American Power Conversion, 181 Fed. App'x 373 (4th Cir. 2006) (unpublished).  In King, the plaintiff's experts believed that the fire at issue had been caused by a faulty computer power source.  Before suit, the plaintiff failed to take steps to safeguard the power source, which was discarded by an unrelated party, and the defendant had no chance to inspect it.  The Fourth Circuit affirmed the dismissal of the case because the defendant had "suffered irreparable prejudice" and could not adequately defend itself against plaintiff's claims.  Id. at 378.

## III.    Factual Background

### A.    Description of the Fireplace

The McNutts' fireplace was in the family room, which shared a common wall with the master bedroom.  The fireplace, which comprised a hearth and a stone-faced mantle/chimney, extended from the common wall into the family room.  App'x, Figs. 1-4.  The hearth/mantle consisted of a wood frame structure faced with stone.  The hearth was elevated about one foot above the floor and extended about one foot into the family room in front of the mantle.  Fig. 6. Inside the hearth was a metal insert (the "firebox") that rested on a plywood base.  Figs. 1-2.

When the house was built in 1999, the general contractor, Bay Country Builders, fabricated the wooden framing for the hearth, including the plywood base.  Bay Country hired BSG, a subcontractor, to install the firebox.  BSG's employee on the McNutt job was Patrick Asbra.  Although Asbra has no recollection of the McNutt job, he described how he would typically install a firebox.  D.'s Ex. 23, 99-105.

During his deposition, Asbra explained that he invariably places a metal safety strip between the edge of the firebox and the plywood base to prevent embers from lodging there and igniting the plywood.  Often, the manufacturer includes a safety strip as part of the firebox kit.  If not, Asbra will fashion a strip from two pieces of aluminum flashing.

Apart from Asbra's testimony concerning his customary practice, <u>see</u> Fed. R. Evid. 406, two other facts furnish indirect proof that he installed a safety strip.  The building inspector, Michael Savage, inspected and passed the fireplace.  Although Savage's affidavit does not mention whether he saw or even looked for a safety strip, Savage customarily checks for general safety and to determine whether the fireplace meets the manufacturer's specifications.   D.'s Ex. 24, Michael L. Savage, Sr. Aff.  Moreover, for five years, the McNutts burned fires in their fireplace frequently and without incident, usually burning one cord of wood per year.  Both of these facts indicate that the firebox was installed safely.

**B.      The Fire and Its Aftermath**

On January 23, 2005, Mrs. McNutt – the only witness to the fire – lit a fire in the fireplace around noon.  In her deposition testimony, Mrs. McNutt states that the wire screen was closed all day, except when she added logs to the fire, but the glass doors in front of the fireplace remained open.  Mrs. McNutt added the last log around 8:00 p.m., and the fire had died down to

embers by the time she went to bed around 10:00 p.m..  Before going to bed, Mrs. McNutt closed

the fireplace's glass doors.  At this point, she noticed nothing unusual.

Shortly thereafter, Mrs. McNutt turned on the recessed overhead lights in her bedroom;

one light popped and went out.  D.'s Ex. 5, Report of Robert Simpson, 2.  She then heard an

unusual crinkling noise coming from the family room.  When Mrs. McNutt went to inspect, she

looked "at an angle" and saw a fire burning "underneath the firebox."  D.'s Ex. 4, McNutt Tr.

20-21.  Mrs. McNutt did not see a fire burning in the firebox.  Mrs. McNutt did not tarry to

determine how the fire had started; she quickly called the fire department and left the house.

The fire damage was extensive.  Photographs taken by Erie's investigators show the

condition of the house after the fire department had put out the fire.  They show that the fire had

charred the wall and ceiling above the firebox (Fig. 5), charred the area directly underneath the

firebox (Fig. 7), and burned through the common wall behind the fireplace (Fig. 7).  The fire

does not appear to have substantially damaged the stone hearth or its wooden supports, however.

Figs. 3-4, 6.

As evidenced by the photographs, when Erie's investigators arrived, they found a

shambles as the firemen had (quite properly) torn apart much of the fireplace while putting out

the fire.  Debris was scattered throughout the first floor.  The metal firebox had been torn out and

deposited in the master bedroom (Fig. 8).  The stone facing of the hearth was broken out in many

places. Metal chimney tubing was cast onto the snow-covered deck and lawn.  Personal effects

were intermixed with overturned furniture.  Many items are unidentifiable because they were

covered by ripped out insulation.

C.      **Erie's Experts' Investigations and Theories of the Case**

Seeking potential subrogation targets, Erie hired three experts to determine the fire's

origin.  The first of these was Michael Schaal of Fire & Arson Investigation Consultants, Inc.

Schaal visited the house on January 24, 2005, the day after the fire.  D.'s Ex. 3, Schaal Report.

Erie also hired an electrical engineer, Robert Simpson, who visited the house on January 26,

2005.  D.'s Ex. 5, Simpson Report.  Finally, Erie hired Kenneth McLauchlan, a mechanical

engineer, who inspected the house on January 28, 2005.  D.'s Ex. 13, McLauchlan Report.

In his report issued on January 31, 2005, Simpson opines that the fire was not caused by a

defect in the wiring or an appliance malfunction.  Among his observations, Simpson noted that

many wires ran in the common wall between the bedroom and the fireplace, an area that was

heavily burned.  Although circuit arcs were present, Simpson concluded that the arcs were the

result of the fire and not its cause.  Simpson also observed that the house had experienced several

electrical problems prior to the fire.  A floor lamp had failed days before, and, as noted above, a

recessed ceiling light had popped and died shortly before Mrs. McNutt discovered the fire.[2]

Schaal issued his report on February 6, 2005.  In it, he relies on certain findings that had

been communicated to him by Simpson and McLaughlin.  He accepted without comment

Simpson's conclusion that the fire was not electrical in nature.  Positing that the conflagration

must have had another cause, he turned to measurements taken by McLaughlin of the clearances

between the firebox and the supporting wooden framework.[3]  Schaal opined that the clearances

were too tight, allowing excessive heat to be radiated from the metal firebox to the wooden

---

[2] Simpson determined that the problem was with the lamp but admits at deposition that he never
inspected it.

[3] Schaall did not measure the clearances himself.

supports.  This is the so-called "clearances theory."  Significantly, Schaal is silent on the subject of a safety strip.

McLauchlan did not issue his report until August 4, 2005.[4]  In it, he rejected the clearances theory, concluding that the clearances "were adequate at the sides and underside of the fireplace."  D.'s Ex. 13, 3.  Instead, McLauchlan concluded that the fire started because metal safety strips were not installed between the fireplace and the wood base of the hearth extension. Id. at 4.  He premises the "safety strip" theory on two facts.  First, Mrs. McNutt reported that she saw burning "underneath" the firebox.  The necessary assumption for her observation is that with a safety strip in place, the area underneath the firebox would not have been visible.  Second, McLauchlan searched for the metal safety strip in the debris and did not find it.

In their reports, therefore, Erie's experts advanced two conflicting theories as to the fire's cause.  From a subrogation standpoint, the clearances theory points the finger of blame at the general contractor, who built the framing into which the firebox was placed.  The safety strip theory blames BSG, which allegedly omitted the critical safety strip.  It bears mentioning that Erie did not fully disavow the clearances theory until Schaal abandoned it at his deposition on September 26, 2008.  D.'s Ex 8, 71-73.

The reports make several points that deserve mentioning.  First, both Schaal and McLauchlan noted the firebox manufacturer's name and address.  This is significant because, armed with this information, Erie had the means to track down and notify the installer before the

---

[4] Schaal's report refers to "Mr. McLaughlin's report under separate cover."  D.'s Ex. 3, 5. McLauchlan's report, however, was not completed until August 4, 2005.  At his deposition, Schaal testified that he did not actually review McLauchlan's report until the day before the deposition.  D.'s Ex. 8, 80.  Schaal explained that he may have reached his conclusion simply by talking to McLauchlan.  Id.

fire scene was destroyed.  Because of this, there is no excuse for Erie's long delay in notifying BSG.

Second, Erie's experts were careful not to remove any physical evidence from the site. They left the site largely undisturbed "due to pending subrogation potential."   Schaal Report 4. Thus, the experts appreciated that any subrogation target would want the opportunity to inspect the scene before it was disturbed.

Third, no independent third-party (e.g., the fire chief or a city fire investigator) conducted an on-site review of the fire's origin and cause.  Thus, the only record that exists was created by agents retained by one of the parties.   This does not necessarily mean that Erie's experts stacked the deck, but it would be manifestly unfair to require  BSG to base its defense on a factual record created by its adversary.

### D.      Erie Foresaw a Subrogation Claim

Erie immediately foresaw a subrogation claim.  Erie's internal Claims Management System ("CMS") contains a note written on January 25, 2005 ( two days after the fire) by William Clem, the claims adjuster Erie assigned to the case.  Clem's CMS note states, "Summary: Subrogation – further investigation needed[;] Details: we have a chance for subro – waiting on report from [cause and origin expert]."  D.'s Ex. 21.

### E.      Erie's Spoliation of All of the Physical Evidence from the Fire

By April 2005, less than three months after the fire, all of the physical evidence had been destroyed.  As explained below, Erie hired and approved the work of three separate contractors but took no steps to preserve any of the physical evidence.

1.     **Spoliation Timeline**

Shortly after the fire, Clem hired two separate contractors to make temporary repairs to the electrical system and to the roof/chimney area.  These repairs were necessary to prevent further property damage from winter weather.  According to the invoices, the electrical work was performed on January 30, 2005, and the roof and chimney were repaired on February 1, 2005.  D.'s Ex. 15.  Neither invoice mention evidence preservation or retention.  To the contrary, the roof/chimney repair invoice specifies "repair of roof" and "repair of chimney and flshings [sic]," acts that would likely involve the destruction of potentially key evidence.

After the house had been protected from the elements, Clem turned to restoring the house to its pre-fire condition.  He received an estimate from Complete Restoration Services for "emergency demo[lition] of subfloor and ceiling to determine the amount of fire damage to dwelling."  D.'s Ex. 15.  The estimate called for two men to "hand carry & load dumpsters of debris" and for a "dump truck & driver" to haul the debris away.  Id.  This debris represented all of the physical evidence from the fire.  The Complete Restoration estimate did not mention evidence preservation or retention.  To the contrary, the inference was clear: evidence would be placed in dumpsters, carted off in a dump truck, and permanently discarded.[5]

Erie's Claims Management System demonstrates that Clem knew and approved the precise scope of Complete Restoration's work.  On March 14, 2005, Clem made a note to a supervisor summarizing the Complete Restoration invoice.  D.'s Ex. 21.  His note does not mention the need to preserve evidence.[6]

---

[5] The only affirmative act Clem claims to have taken to protect the evidence was to have Schaal cordon off some items with yellow caution tape.

[6] Erie's records show that the Complete Restoration invoice was paid on March 17, 2005, and the work was performed sometime between March 14, 2005 and April 8, 2005.

By April 8, 2005, only two and a half months after the fire, Complete Restoration's work was complete.  As of this date, Clem had not provided notice to any potential subrogation targets.

### 2.    Notice Timeline to Potential Subrogation Targets

Erie's first subrogation target was the general contractor who built the house, Ken Carlson of Bay Country Builders.  Clem attempted to notify Carlson of Erie's potential claim in a letter dated February 4, 2005.  After Clem learned that the address for Carlson was incorrect, he sent a second letter dated March 24, 2005.

Clem spoke to Carlson on April 9, 2005.  Carlson advised Clem that Bay Country Builders was insured by Erie.  At thid point, Bay Country Builders fell by the wayside as a subrogation target because it would make no sense for Erie to seek recovery against itself.

As mentioned, Erie knew the manufacturer and serial number of the firebox as early as January 2005.  Had Erie promptly contacted the manufacturer, it would have learned that BSG was the purchaser.  Erie did not pursue this lead, however, and it did not become aware of BSG's role until May 2005 when it was advised by Bay Country Builders.   Despite this knowledge, Erie did not notify BSG of its subrogation claim until August 23, 2006, nineteen months after the fire and more than eighteen months after Erie learned of BSG's role.[7]

---

[7] Clem claims to have dictated a letter to BSG in May 2005 notifying BSG of Erie's potential subrogation claim.  Unlike other dictated letters, Erie's CMS contains no entry to prove that Clem's dictation was either transcribed or mailed.  Regardless, by May 2005, the evidence had already been destroyed.

IV.     **Discussion**

Silvestri posits an either/or test.  Dismissal is warranted if either the spoliator's conduct was so egregious as to make forfeiture of its claim an apt remedy, or if the loss of the evidence is so prejudicial that it substantially denies the defendant the ability to defend the claim.  Both prongs of the test are satisfied in this case.

A.      **The Spoliator's Conduct**

Erie's conduct was lax enough to justify the forfeiture of its claim.  As a sophisticated insurer, Erie is well versed in the law of subrogation.  Erie promptly hired experts to determine whether it had a viable subrogation claim.  Within two weeks of the fire, it received reports pointing to a defect in the fireplace as the likely cause.   Despite this, Erie took no steps to preserve the fire scene or to seasonably notify either potential subrogation target.  This lapse can only be characterized as negligent.

B.      **The Evidence Spoliation Irreparably Prejudices Defendant's Case**

The second prong of Silvestri requires the Court to determine whether the spoliation substantially denies BSG's ability to defend itself.  There are two aspects to this inquiry.  First, the Court must examine the record that remains to determine whether it contains enough data to allow BSG to test the safety strip theory and rule out or develop alternative theories.  Second, the Court must decide whether a lesser sanction than dismissal would level the playing field.  In this case, both questions must be answered in the negative.

From BSG's standpoint, the critical determinant is whether the safety strip could have been located in the debris.  The parties agree that the strip, being metal, would have survived the fire.  Asbra testified that he would not have nailed or screwed the strip to the plywood base.

Rather, he would have placed it between the firebox and the base.  Once the firemen broke away the stones and removed the firebox, the safety strip would have been a loose piece of metal that could have been anywhere in the debris.

On deposition, McLauchlan testified that he sifted through the debris in the crawl space beneath the fireplace.  His search was not exhaustive, however, and he did not explore the debris in the front yard, the master bedroom, or the living room.[8]  Without an exhaustive search, the existing record is incomplete.  BSG would have been motivated to undertake an exhaustive sifting of all the debris, and one cannot say that such a search would have been fruitless.

The destruction of the fire scene also deprived BSG of the opportunity to thoroughly pursue two potential defenses.  First, Schaal's clearances theory may have been correct.  The renovation of the home, however, prevented BSG from conducting its own measurements of the fireplace and surrounding framing.

Second, the fire may have been caused by an electrical problem.  As mentioned, Simpson noted that the house had experienced several electrical problems prior to the fire.  The photographs and other remaining evidence are inadequate to determine the condition of the electrical devices and wiring near where the fire originated.  Without this information, BSG can neither rule out nor advance an electrical theory of causation.

### C.      Dismissal is the Only Appropriate Sanction

There are no feasible sanctions short of dismissal.  One possible intermediate sanction would be to give the jury a spoliation instruction, directing them to presume that the spoiled evidence would have been unfavorable to Erie.  Such an instruction would not level the playing

---

[8] McLauchlan also admitted that he was not familiar with the type of safety strip that would have been installed in the McNutts' fireplace.  So, he did not know what he was looking for.

field, however, because BSG would still be required to rely on a record compiled almost exclusively by Erie's experts.  In <u>Silvestri</u>, the Fourth Circuit affirmed the dismissal of Silvestri's claim because "require[ing] General Motors to rely on the evidence collected by Silvestri's experts in lieu of what it could have collected would result in irreparable prejudice." <u>Silvestri</u>, 271 F.3d at 594.

A second potential intermediate sanction would be to limit each side to the physical evidence that survives.  In other words, each side would be required to rely on the witness statements and the photographs of the fire scene.  Under this alternative, neither side could rely on the reports of Erie's experts.  Such a sanction would be tantamount to a dismissal of Erie's case.  Without the measurements and contemporaneous observations of its experts, Erie's trial expert could not express an opinion to a reasonable degree of certainty as to the fire's cause. Thus, the intermediate sanction would lay Erie open to an inevitable <u>Daubert</u> challenge.[9]

## V.    Conclusion

Under the controlling law, Erie's claim must be dismissed because its negligent spoliation of the fire scene irretrievably prejudiced BSG's ability to defend itself.  In a separate order of even date, the Court will GRANT BSG's motion for summary judgment and DISMISS the case.

_____/s/_____
Benson Everett Legg
Chief Judge

---

[9] Mrs. McNutt's testimony that she could see burning beneath the fire box does not mean that the safety strip was necessarily missing. Patrick Asbra, BSG's installer, explained the safety strip was not attached to the firebox.  In other words, the underside of the firebox would have been visible whether or not the strip was in place.  Absent a conscientious search for the safety strip, which did not happen due to Erie's fault, a jury would not be in a position to evaluate this issue.

Photo Appendix

Figures 1 & 2

The McNutt family room during 1999 construction showing mantle and hearth before the stone facing was applied and before firebox was installed.  Behind the fireplace area is the master bedroom.





Figures 3 & 4

Stone-faced fireplace with firebox removed.  The view is from the family room through the mantle into the master bedroom.  The master bedroom has a ceiling fan and a wreath on the back wall.  Figure 3 was taken immediately after the fire.  Figure 4 was taken after some rehabilitation and debris removal had occurred.





Figure 5

A vertical view of the living room looking through chimney area into first floor master bedroom and second floor hallway.  Roof damage is apparent.



Figure 6

Close-up view of hearth with firebox removed.  The stone hearth meets the mantle, which extends into the living room.  The hearth is approximately one foot tall by one foot deep.



Figure 7

View of firebox area from master bedroom.  This view looks through where the wall and firebox was into the living room where a couch is visible.  A large number of wires are seen.



Figure 8

The prefabricated firebox sitting in the master bedroom.  The wire screen is visible, but the previously attached glass doors are missing.



Figure 9

Identification plate from prefabricated metal firebox shows the manufacturer's name and address, and the firebox's model and serial numbers.

